IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ALTICOR INC., and | ) | |
| | ) | |
| AMWAY CORP., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cv-00308 |
| | ) | |
| YIELD NATION, LLC, | ) | |
| | ) | |
| Defendant. | ) | **Jury Trial Demanded** |

**Plaintiffs' Memorandum in Support of their Motion for a Preliminary Injunction**

Defendant Yield Nation is intentionally passing off its agricultural foliar spray and seed-treatment products as Plaintiffs' Nutriplant® brand of competing products.  Yield Nation preys on independent farmers whom Yield Nation knows are existing Nutriplant® customers and who intend to continue using Nutriplant® in upcoming growing seasons.  Purporting to sell Nutriplant®, Yield Nation convinces those existing Nutriplant® customers to purchase thousands of dollars of what they believe are the same Nutriplant® products they have bought in the past.  Months later, after Yield Nation has cashed those farmers' checks, Yield Nation delivers its own, entirely different products, all while continuing its ruse.  The Yield Nation products are not just different from the Nutriplant® products they purport to be; they are defective, and often unusable.  And when those Yield Nation products are used, they cause the farmers substantial harm, including by clogging the machinery used to apply them, which in turn costs farmers critical time, money, resources, and growing opportunities.

Yield Nation's acts have caused, and continue to cause, irreparable harm to the

reputations and goodwill of Nutriplant® and Plaintiffs, in parallel with the harm to the farmers who receive the defective Yield Nation products.  As a direct result of Yield Nation's lies, growing ranks of longtime or prospective Nutriplant® customers across the Midwest are purchasing products that they believe are Nutriplant® from Yield Nation.  Beyond these substantial diverted sales, Plaintiffs are injured irreparably through their customers' uniformly negative experiences with the substitute products they receive from Yield Nation, which Yield Nation continues to represent are Nutriplant® long after the sale, delivery and product failures. Word of the supposed "Nutriplant®" failures and defects is spreading across farming communities in states representing a core Nutriplant® customer base, including Missouri, Illinois, and Iowa.

An injunction against Yield Nation's unlawful conduct is all-the-more urgent at this time, as farms currently are gearing up for the next crop with foliar and seed treatment purchases.  If Yield Nation is not restrained immediately, another sales wave of Yield Nation's falsely-designated products will cause further damage to Plaintiffs, their Nutriplant® brand, and their customers.  At the same time, there is a substantial likelihood that other Nutriplant® customers, dissatisfied with the defective Yield Nation substitute that they still believe is Nutriplant®, will stop using Nutriplant® and turn to other competitors' products.

By this Motion, Plaintiffs hereby request that the Court issue a preliminary injunction barring Yield Nation from passing off its product as Nutriplant® and infringing on the Nutriplant® mark, in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and § 1114(1), in the manner set forth below.

## Background

### I.   The Plaintiffs

Alticor Inc. and Amway Corp. (collectively "Plaintiffs" or "Amway") are worldwide

leaders in developing, manufacturing, and providing nutrition, beauty, bath and body, cookware, household, agricultural, and other products to consumers under various brands, including Amway® and Nutriplant®.  Amway products (including Nutriplant® products) are sold to U.S. consumers only through Amway.com and through Amway Independent Business Owners ("IBOs"), which enter into contracts with Amway to be able to sell Amway products.  Ex. 1, Seurynck Decl. ¶ 12.

Plaintiffs spend a significant amount of time, energy, and resources toward protecting the value of their brands, products, name, and reputation.  Id. ¶ 13.  By distributing products exclusively through their own website and through IBOs, Plaintiffs ensure the safety, well-being, and satisfaction of consumers and maintain the integrity and reputation of the Amway family of brands.  IBOs provide Amway's customers with explanations and guidance about the safe and proper use of Amway products.  In the highly competitive nutrition, household and agricultural-product market, quality and customer service are a fundamental part of the consumer's decision to purchase a product.

Nutriplant® brand agricultural products include Nutriplant® AG and Nutriplant® SD. Id. ¶ 10.  Nutriplant® AG is a liquid foliar nutritional supplement—essentially a spray fertilizer. Id. ¶ 11.  It is mixed with water and sprayed on crop leaves.  Id.  Nutriplant® SD is a powdered nutritional seed treatment. Id.  As with other Alticor and Amway products, Nutriplant® AG, Nutriplant® SD, and other Nutriplant® brand products are sold exclusively through Amway and its IBOs.  Id. ¶ 12.

## II.    The Nutriplant® Trademark

To promote and protect the Amway family of brands, Plaintiff Alticor has registered numerous trademarks with the United States Patent and Trademark Office.  Id. ¶ 3.  These

trademarks include, but are not limited to, the Nutriplant® mark (U.S. Trademark Registration No. 2421752).  Id. ¶ 5.  The registration of the Nutriplant® mark is valid, subsisting, and in full force and effect.  Id. ¶ 6.   Plaintiffs actively use and market the Nutriplant® mark in commerce.  Id. ¶ 7.  Due to the quality and exclusive distribution of Nutriplant® products, and because Plaintiffs are recognized as the sources of high-quality products, the Nutriplant® mark has substantial value.  Id. ¶ 14.   Alticor has licensed the Nutriplant® mark to Amway.  Id. ¶ 8.  Alticor has not licensed the use of the Nutriplant® mark to any other non-Alticor related entities.  Id. ¶ 9.  Amway has the right to use the Nutriplant® trademark.  Id. ¶ 8.  A copy of the Certificate of Registration for the Nutriplant mark, Reg. No. 2421752 is attached as Exhibit 1 to the Declaration of John Seurynck.  Id. ¶ 5.

Based on their performance in the field and other attributes, Nutriplant® AG and Nutriplant® SD are popular with consumers and enjoy a reputation for quality.  Further, Nutriplant® AG and Nutriplant® SD customers typically are repeat customers, having used Nutriplant® AG and Nutriplant® SD in previous growing seasons.

Yield Nation had, at a minimum, constructive notice, at all relevant times, of Plaintiffs' ownership and other rights in the registration of the Nutriplant mark.

## III.   Yield Nation

Yield Nation manufactures, sells, and delivers agricultural products to consumers in states including but not limited to Missouri, Illinois, and Iowa.  See, e.g., Ex. 2, Maubach Decl.; Ex. 3, Schewe Decl.; Ex. 4, Klockenga Decl.  Yield Nation's customers consist primarily of independent farms and farm owners.  See, e.g., id.

Yield Nation was formed in January 2020 by Benjamin Buckwalter.  Ex 5, Articles of Incorporation.  In addition to his management role with Yield Nation, Yield Nation also

represents to consumers that Buckwalter is a Yield Nation sales representative.  See, e.g., Ex 6, Klockenga Decl. at Ex. A (Yield Nation sales receipt listing Buckwalter as "Sales Rep.").

Separate from his involvement with Yield Nation, Buckwalter was formerly an Amway IBO.  In his former capacity as an IBO, Buckwalter sold Nutriplant® products through Amway. During this time, he became familiar with Amway's Nutriplant® products.  As an IBO, Buckwalter interacted directly with Nutriplant® customers and experienced first-hand the strong consumer demand and high marketability of Nutriplant® products, including Nutriplant® AG and Nutriplant® SD.  Buckwalter resigned as an Amway IBO in early 2020.

## IV.    Yield Nation's False and Misleading Representations that it Sells Nutriplant®

Yield Nation sells its agricultural products under the false pretense that that they are Nutriplant® products.  Since at least its formation in January 2020 and continuing through the present, Yield Nation, through Buckwalter, has held itself out to consumers as a distributor of Nutriplant® products, including Nutriplant® AG and Nutriplant® SD.  See, e.g., Ex. 6, Feezel Decl.; Ex. 7, Greenwood Decl.; Ex. 4, Klockenga Decl.; Ex. 8, LaFont Decl.; Ex. 9, Lemke Decl; Ex. 2, Maubach Decl; Ex. 10, Rapp Decl.; Ex. 11, Roser Decl; Ex. 3, Schewe Decl; Ex. 12, Waier Decl; Ex. 13, Zimmerman Decl.

This is false. Yield Nation is not licensed to sell Nutriplant® products and does not, in fact, sell Nutriplant® products.  Ex. 1, Seurynck Decl. ¶¶ 8–9, 15.  Yield Nation has no relationship with Nutriplant®, Amway, or Alticor.  Id. at ¶ 15.

Yield Nation misleads consumers about its products in several ways.  In all events, Yield Nation sells its products under the false pretense that it is selling Nutriplant® products.  See, e.g., Ex. 6, Feezel Decl.; Ex. 7, Greenwood Decl.; Ex. 4, Klockenga Decl.; Ex. 8, LaFont Decl.; Ex. 9, Lemke Decl; Ex. 2, Maubach Decl; Ex. 10, Rapp Decl.; Ex. 11, Roser Decl; Ex. 3, Schewe Decl;

Ex. 12, Waier Decl; Ex. 13, Zimmerman Decl.

Yield Nation frequently targets farmers who Yield Nation knows are current Nutriplant®
AG and Nutriplant® SD customers.  See, e.g., Zimmerman Decl. ¶¶ 2–5; Waier Decl. ¶¶ 3–8;
Schewe Decl. ¶¶ 3–9; LaFont Decl. ¶¶ 3-8; Klockenga Decl. ¶¶ 3–5; Rapp Decl. ¶¶ 3–7;
Greenwood Decl. ¶¶ 3–10; Maubach Decl. ¶¶ 3–7; Feezel Decl. ¶¶ 3–9.  Many of those farmers
purchased genuine Nutriplant® AG and Nutriplant® SD through Buckwalter when he was an
Amway IBO.  See id.  Yield Nation, through its representatives, including Buckwalter,
represents to these consumers that Yield Nation continues to sell Nutriplant®.  Id.  Yield Nation
conceals from those farmers that it is not authorized to sell Nutriplant® products, that it has no
Nutriplant® inventory, and that it cannot supply Nutriplant®.  See id.

For example, starting in late 2019, in advance of the 2020 growing season, Yield Nation,
through Buckwalter, approached several existing Nutriplant® customers to whom Buckwalter
had sold in the past and asked if they were happy with "the product" (in reference to the
Nutriplant® he had sold them the previous year).  See, e.g., Ex. 3, Schewe Decl. ¶¶ 9–10; Ex. 4,
Klockenga Decl. ¶ 5.  Yield Nation, through Buckwalter, further asked if they wanted to place
orders for "the product" or to "purchase more" for the upcoming season.  See, e.g., id.  In this
way, Yield Nation exploits the customer's prior experiences purchasing Nutriplant® from
Buckwalter.  Yield Nation's deception does not stop there, however.  In all cases, Yield Nation,
through Buckwalter, affirmatively represents to consumers through statements made by
telephone, text message, and in person that it distributes Nutriplant® and that the agricultural
products the consumers are purchasing are Nutriplant®.  See, e.g., Ex. 13, Zimmerman Decl.
¶¶ 2–5; Ex. 12, Waier Decl. ¶¶ 3–8; Ex. 3, Schewe Decl. ¶¶ 3–9; Ex. 8, LaFont Decl. ¶¶ 3–8; Ex.
4, Klockenga Decl. ¶¶ 3–5; Ex. 10, Rapp Decl. ¶¶ 3–7; Ex. 7, Greenwood Decl. ¶¶ 3–10; Ex. 2,

Maubach Decl. ¶¶ 3–7; Ex. 6, Feezel Decl. ¶¶ 3–9.

## V.      Yield Nation's False and Misleading Sales Materials

In addition to its false and misleading statements about the origin of its products, Yield

Nation provides consumers with sales materials that depict Nutriplant® products, the

Nutriplant® mark, and images of Nutriplant® products to further its deception.  For example, in

making its sales, Yield Nation provides farmers with a "Sales Receipt" that purports to depict the

products Yield Nation offers for sale.  The Nutriplant® mark is used and pictured in the sales

receipt.  An example is copied below.



See, e.g., Ex. 4, Klockenga Decl. at Ex. A; see also, e.g., Ex. 6, Feezel Decl. at Ex. A; Ex. 10, Rapp

Decl. at Ex. B; Ex. 7, Greenwood Decl. at Ex. B; Ex. 3, Schewe Decl. at Exs. C, D; Ex, 9, Lemke

Decl. at Ex. C.   Specifically, the Yield Nation Sales Receipts typically include images of Nutriplant® AG, Nutriplant® SD, and Nutriplant® APSA-80, a weed control spray.



Ex. 4, Klockenga Decl. at Ex. A; see also, e.g., Ex. 6, Feezel Decl. at Ex. A; Ex. 10, Rapp Decl. at Ex. B; Ex. 7, Greenwood Decl. at Ex. B; Ex. 3, Schewe Decl.at Exs. C, D, E; Ex. 9, Lemke Decl. at Ex. C.   Yield Nation provides farmers with the Sales Receipt prior to payment.   Id.; see also, e.g., Ex. 10, Rapp Decl. ¶¶ 7–8; Ex. 3, Schewe Decl. ¶ 10.

Lest customers have any doubt about the products they are purchasing, the Sales Receipt specifically lists the category, quantity, and price of each Nutriplant® product that Yield Nation purports to be selling the farmers.



Ex. 4, Klockenga Decl. at Ex. A; see also, e.g., Ex. 6, Feezel Decl. at Ex. A; Ex. 10, Rapp Decl.,

at Ex. B; Ex. 7, Greenwood Decl. at Ex. B; Ex. 3, Schewe Decl. at Exs. C, D, E; Ex. 9, Lemke

Decl. at Ex. C.  Nutriplant® products are the only products depicted on the Yield Nation Sales

Receipts.  Id.  The Sales Receipts confirm to the buyers that the products they are purchasing are

Nutriplant® products.  See, e.g., Ex. 10, Rapp Decl. ¶ 7.

      Yield Nation also uses the Nutriplant® mark in its marketing and promotional materials.

See Ex. 9, Lemke Decl. at Ex. A.  Yield Nation provides farmers with a Yield Nation brochure

that profiles Nutriplant® AG and Nutriplant® SD.

  

The brochure provides detailed information about Nutriplant® AG and Nutriplant® SD,

including information relating to application, costs, and performance of those Nutriplant®

products.  The brochure even describes Nutriplant® AG and Nutriplant® SD as "our products" and as "Yield Nation's crop solutions."  The brochure uses and depicts the Nutriplant® mark.

Yield Nation does not stop there.  It also provides customers irrigated soybean and corn trial results for Nutriplant® products to further reinforce the pretense that it is selling those Nutriplant® products.  Ex. 9, Lemke Decl. ¶ 6 & Ex. B.

The customers rely on each of these representations and depictions when agreeing to purchase, through Yield Nation, products that they believe are Nutriplant®.  See, e.g., Ex. 9, Lemke Decl. ¶¶ 8–9; Ex. 3, Schewe Decl. ¶ 10; Ex. 12, Waier Decl. ¶ 7–8; Ex. 4, Klockenga Decl. ¶ 6.

## VI.     Consumers Pay Yield Nation for What they Are Told is Nutriplant®

In reliance on Yield Nation's representations, omissions, and false sales materials, farmers place orders with Yield Nation for specific Nutriplant® products.  See, e.g., id.  After receiving the Sales Receipts, and before receiving the products, the farmers pay Yield Nation by check as instructed by the Sales Receipt.  Id.  Customers typically pay Yield Nation thousands of dollars for each order.  See id.

## VII.    After Payment, Yield Nation Delivers Products that Are Not Nutriplant®.

After purporting to sell Nutriplant® products to the farmers, Yield Nation ultimately delivers its own Yield Nation products.  The Yield Nation products are different products, with packaging that resembles in many ways the packaging of the Nutriplant® products but with Yield Nation labels.  See, e.g., Ex. 4, Klockenga Decl. ¶ 7; Ex. 8, LaFont Decl. ¶ 9; Ex. 2, Maubach Decl. ¶¶ 8–11.

Yield Nation's deception does not stop there.  Instead, it continues to deceive farmers about the Yield Nation products.  When Yield Nation delivers the products, it represents, through

10

affirmative statements and omissions of fact, that the Yield Nation products are Nutriplant®,

despite differences in packaging and labeling.  For example, when asked about the different

packaging on the Yield Nation products, Yield Nation represents to farmers that Nutriplant® had

changed its packaging while the product remained the same.  Ex. 8, LaFont Decl. ¶ 9.  Yield

Nation makes these representations several ways.  It asserts that the labelling changed because

Yield Nation had outsourced manufacturing of Nutriplant® to a different company, Ex. 12,

Waier Decl. ¶ 13; it assures customers that Yield Nation simply put the product "in a different

bucket this year," Ex. 3, Schewe Decl. ¶ 13; and it explains that Yield Nation had purchased the

product "in bulk and repackaged it to save costs for farmers," Ex. 2, Maubach Decl. ¶ 11.  As a

result, even where buyers observe differences in the packaging or labeling of the products they

receive, Yield Nation insists that the products are Nutriplant®, with only cosmetic or other non-

material differences, and perpetuates the false pretense that Yield Nation sells Nutriplant®.

**VIII.   The Yield Nation Products Do Not Perform Like Nutriplant® Products**

There are meaningful and substantial differences between the Nutriplant® products that

Yield Nation purports to sell and the Yield Nation products that Yield Nation delivers to

customers.  For one, the Yield Nation products are defective.  The Yield Nation seed treatment

(represented by Yield Nation as Nutriplant® SD) arrived in solid chunks, rather than in the fine

powder form of Nutriplant® SD.  See, e.g., Ex. 8, LaFont Decl. ¶ 10; Ex. 9, Lemke Decl. ¶ 14.

This condition limits farmers' ability to use the treatment because the planter equipment that is

used to spread the seed is designed to use the fine powder, not chunks.  Nutriplant® SD does not

have that problem.  Ex. 2, Maubach Decl. ¶ 12; Ex. 6, Feezel Decl. ¶ 11; Ex. 8, LaFont Decl.

¶ 10; Ex. 3, Schewe Decl. ¶ 17.

The Yield Nation foliar spray (represented by Yield Nation as Nutriplant® AG) is also

11

defective.  Among other issues, the foliar spray separates, with heavier particles on the bottom of the container and lighter particles near the top, and does not mix.  See, e.g., Ex. 10, Rapp Decl. ¶ 11; Ex. 4, Klockenga Decl. ¶¶ 8–9; Ex. 9, Lemke Decl. ¶ 12; Ex. 2, Maubach Dec. ¶¶ 13–16; Ex. 12, Waier Decl. ¶¶ 11–12; Ex. 3, Schewe Decl. ¶ 12.  This is not a trivial problem.  When the Yield Nation foliar spray settles out, it clogs the sprayers farmers use to apply the spray and other products, which in turn costs time and money to repair and also can result in lost growing opportunities.  Ex. 4, Klockenga Decl. ¶¶ 8–9; Ex. 3, Schewe Decl. ¶ 16.  Nutriplant® AG does not present that problem.  See, e.g., Ex. 10, Rapp Decl. ¶ 11; Ex. 2, Maubach Decl. ¶¶ 13–15.

As with the product labelling, Yield Nation continues to conceal its bait-and-switch from farmers when they raise concerns about the Yield Nation products.  In several cases, the condition of the foliar or the seed treatment makes it completely or partially unusable.  See, e.g., Ex. 3, Schewe Decl. ¶ 17; Ex. 8, LaFont Dec. ¶ 10; Ex. 13, Zimmerman Decl. ¶¶ 8–9.  Yield Nation claimed that the chunky seed treatment was caused by isolated issues with the Nutriplant® manufacturer.  See, e.g., Ex. 2, Maubach Decl. ¶ 12.

## IX. Yield Nation's Actions Harm Nutriplant®'s Sales, Mark, Reputation, and Goodwill.

Through Yield Nation's initial deception and continued concealment, farmers believe that Nutriplant® products are defective and poorly performing based on their experience with what in fact are Yield Nation products.  See, e.g., Ex. 8, LaFont Decl. ¶ 12; Ex. 4, Klockenga Decl. ¶ 13; Ex. 10, Rapp Decl. ¶¶ 12, 14; Ex. 2, Maubach Decl. ¶ 18.  Farmers thus come to view Nutriplant® as low-quality products sold by untrustworthy salesmen.  See, e.g., Ex. 10, Rapp Decl. ¶ 14; Ex. 2, Maubach Decl. ¶ 18; Ex. 9, Lemke Decl. ¶ 17.  Even buyers who previously had positive experiences with Nutriplant® and who intended to keep using Nutriplant® on their crops have come to view Nutriplant® as inferior due to the defects and failures they experienced

with the products they purchased from Yield Nation.  See, e.g., id.  In some cases, farmers who

previously purchased large quantities of Nutriplant® are no longer willing to do so.  Ex. 11,

Roser Decl. ¶ 13.  More generally, as a result of Yield Nation's passing off its products as

Nutriplant®, and the subsequent failures of those products to perform, false reports of defective

Nutriplant® products and negative experiences with Nutriplant® products are circulating in

agricultural communities, causing further widespread harm to the Nutriplant® brand and

Plaintiffs.  See, e.g., Ex. 9, Lemke Decl. ¶ 16.  In these ways and others, Yield Nation has

damaged, and continues to damage, Nutriplant®'s reputation and goodwill.

Argument

## I.      Standard of Review

Four factors govern the grant of preliminary injunctive relief: (1) the probability that the

moving party will succeed on the merits; (2) the threat of irreparable harm to the moving party if

an injunction is not granted, (3) the harm suffered by the moving party if injunctive relief is

denied as compared to the effect on the non-moving party if the relief is granted, and (4) the

public interest.  Dataphase Sys. Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir.1981) (en

banc). Each of these factors strongly favor Plaintiffs.

## II.     The Preliminary Injunction Factors Weigh Heavily in Favor of a Preliminary
            Injunction.

### A.      Plaintiffs Are Likely to Succeed on their Claims for Unfair
             Competition and Trademark Infringement.

"[T]he probability of success factor is the most significant" of the preliminary injunction

factors.  Home Instead, Inc. v. Florance, 721 F.3d 494, 497 (8th Cir. 2013).  At the preliminary

injunction stage, the plaintiff need only demonstrate some likelihood that it will ultimately

prevail on its claims.  See Small Hearts Daycare, II, LLC v. Quick, No. 4:09-CV-2132 HEA,

13

2010 WL 427766, at *3 (E.D. Mo Feb. 1, 2010) ("At this stage in the proceeding, the court does

not decide whether the movant will ultimately win, nor must the movant prove a greater-than-

fifty-percent likelihood of success.").  "Thus, a showing of likelihood of success on the merits

requires simply that the moving party find support for its position in the governing law."

Noodles Dev't, LP v. Ninth Street Partners, LLP, 507 F. Supp. 2d 1030, 1034–35 (E.D. Mo.

2007) (citing Baker Elec. Co-op, Inc. v Chaske, 28 F.3d 1466, 1472 (CA 8, 1994)).

Yield Nation's passing off scheme violates the Lanham Act's prohibitions of unfair

competition and trademark infringement.  See, e.g., 15 U.S.C. §§ 1125(a)(1)(A), 1114(1).  Under

§ 1125(a)(1)(a), the Lanham Act forbids the use in commerce of "any word, term, name, symbol,

or device, or any combination thereof, or any false designation of origin, which . . . is likely to

cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association

of such person with another person, or as to the origin . . . of his or her or another person's

goods."  The Lanham Act thus establishes a federal remedy for unfair competition arising from

"false designation of origin or other false representation used in connection with the sale of a

product."  Metric & Multistandard Components Corp. v. Metric's, Inc., 635 F.2d 710, 713 (8th

Cir. 1980).  Passing off (also referred to as "palming off") is a form of false designation of origin

"where one competitor tries to fool the consuming public into thinking that his product is really

the product of another.'" Etrailer Corp. v. Onyx Enterprises, Int'l Corp., No. 4:17-CV-01284-

AGF, 2017 WL 3021496, at *4 (E.D. Mo. July 17, 2017) (quotations omitted); see also

DaimlerChrysler AG v. Bloom, 315 F.3d 932, 937 (8th Cir. 2003) ("Passing off occurs where a

company sells its goods or services under the pretense that they are the goods or services of

another.").  Thus "Section 43(a) of the Lanham Act . . . forbids, for example, the Coca–Cola

Company's passing off its product as Pepsi–Cola or reverse passing off Pepsi–Cola as its

14

product."  Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 29 (2003).

Section 1114(1) forbids the unauthorized:

(a) use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114.  "The owner of 'a registered mark . . . has a civil action against anyone employing an imitation of it in commerce when 'such use is likely to cause confusion, or to cause mistake, or to deceive.'"  ZW USA, Inc. v. PWD Sys., LLC, 889 F.3d 441, 445–46 (8th Cir. 2018) (quotations omitted).

To prevail on their passing off claim, Plaintiffs must show two things.  First, that Yield Nation used in commerce, in connection with the sale of its products, false designations and representations of the origin of its products.  Second, that those false designations of origin are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Yield Nation's products with Plaintiffs' Nutriplant® products, or as to the origin of Yield Nation's products.  15 U.S.C. § 1125(a)(1)(A); Toro Co. v. R & R Prods. Co., 787 F.2d 1208, 1214 (8th Cir. 1986); My Pillow, Inc. v. LMP Worldwide, Inc., 331 F. Supp. 3d 920, 933 (D. Minn. 2018).  Similarly, to prevail on their trademark claim, Plaintiffs must show that Yield Nation used without authorization the Nutriplant® mark in connection with the sale of Yield Nation's products and that such use is likely to cause confusion, or to cause mistake, or to deceive.  15 U.S.C. § 1114(1); Cmty. of Christ Copyright Corp. v. Devon Park Restoration

15

Branch of Jesus Christ's Church, 634 F.3d 1005, 1009 (8th Cir. 2011) (analyzing together

trademark and false designation of origin claims).  Proof of damages is not required for a

plaintiff to obtain injunctive relief.  Porous Media Corp. v. Pall Corp., 110 F.3d 1329, 1335 (8th

Cir. 1997).  The evidence shows that a reasonable jury is likely to find in favor of Plaintiffs.

> 1.  *Yield Nation Uses in Commerce Names, Marks, Symbols, Designations, and Statements to Mislead Customers about the Source of its Products.*

Yield Nation falsely designates and represents the source of its agricultural products by

passing its products off as Nutriplant® products, including through the misuse of Plaintiffs'

Nutriplant® mark.[1]  See, e.g., Ex. 13, Zimmerman Decl. ¶¶ 2–5; Ex. 12, Waier Decl. ¶¶ 3–8; Ex.

3, Schewe Decl. ¶¶ 3–9; Ex. 8, LaFont Decl. ¶¶ 3–8; Ex. 4, Klockenga Decl. ¶¶ 3–5; Ex. 10,

Rapp Decl. ¶¶ 3–7; Ex. 7, Greenwood Decl. ¶¶ 3–10; Ex. 2, Maubach Decl. ¶¶ 3–7; Ex. 6, Feezel

Decl. ¶¶ 3–9.  Yield Nation approaches existing Nutriplant® customers and offers to sell those

customers "more" product for the coming year.  Then, Yield Nation expressly represents to

customers that it sells Nutriplant®.  Indeed, Yield Nation represents at all times that Yield

Nation sells the same products that those customers purchased in the past.  To further its

deception, Yield Nation provides customers with brochures containing the Nutriplant® mark and

tradenames for Nutriplant® AG and Nutriplant® SD.  See Ex. 9, Lemke Decl. at Ex. A.  Those

brochures describe the Nutriplant products as "our products."  Id.

Yield Nation's false designations of origin do not stop there.  When making its sales and

before delivering its products, Yield Nation provides customers Sales Receipts that contain

---

[1]     Plaintiffs have a protectable interest in Nutriplant®.  Alticor owns the Nutriplant mark, and only Amway and certain other subsidiaries of Alticor have the exclusive licensed authorization to sell Nutriplant® products.  Seurynck Decl. ¶¶ 3–9.

photographs of Nutriplant® AG, Nutriplant® SD, and other Nutriplant® products.  Ex. 4,

Klockenga Decl. at Ex. A; see also, e.g., Ex. 6, Feezel Decl. at Ex. A; Ex. 10, Rapp Decl. at Ex.

B; Ex. 7, Greenwood Decl. at Ex. B; Ex. 3, Schewe Decl. at Exs. C, D, E; Ex. 9, Lemke Decl. at

Ex. C.  The Sales Receipts typically display the Nutriplant® mark and tradedress.  The Sales

Receipts further expressly describe the product that the customers are purchasing as

"Nutriplant."  Indeed, at no time before consummating its sales with customers does Yield

Nation offer to sell any product other than Nutriplant®.  Contrary to Yield Nation's

representations, however, the products it delivers are not Nutriplant®.  Instead, Yield Nation

delivers to farmers its own Yield Nation products.

Yield Nation's actions are quintessential passing off and infringement.  DaimlerChrysler,

315 F.3d at 937.  Through its use of the Nutriplant® name and marks and its express and implied

representations that it is selling Nutriplant®, Yield Nation "sells its goods or services under the

pretense that they are the goods or services of another."  Id.; Dastar, 539 U.S. at 29.

In summary, the evidence shows that Yield Nation uses its false and misleading words,

names, and symbols regarding the origin of its product, as well as the Nutriplant® trademark, in

commerce in connection with the sale of goods purchased in and shipped to states including

Missouri, Illinois, and Iowa.  15 U.S.C. §§ 1114(1); 1125(a)(1)(A); 1127.

> **2.**     ***Yield Nation's False and Misleading Representations About the
> Source of its Products and its Use of the Nutriplant® Name, Mark, and
> Images Are Likely to Confuse or Deceive Consumers.***

Unfair competition and trademark infringement claims both require that "the materials

used by the defendant created a likelihood of confusion, deception or mistake on the part of the

consuming public."  Toro, 787 F.2d at 1214; Christ Copyright Corp., 634 F.3d at 1009.

Generally, the likelihood of confusion depends on several factors, not one of which is

determinative: (1) the strength of the trademark; (2) the similarity between the parties' marks; (3) the competitive proximity of the parties' products; (4) the alleged infringer's intent to confuse; (5) evidence of actual confusion; and (6) the degree of care reasonably expected of potential customers. Co-Rect Prods., Inc. v. Marvy! Advert. Photography, Inc., 780 F.2d 1324, 1330 (8th Cir. 1985); Lovely Skin, Inc. v. Ishtar Skin Care Prods., LLC, 745 F.3d 877, 887 (8th Cir. 2014). These factors "do not operate in a mathematically precise formula." First Nat. Bank in Sioux Falls v. First Nat. Bank, S. Dakota, 153 F.3d 885, 888 (8th Cir. 1998). "[N]o particular factors are determinative, [and] neither should excessive importance be placed on any one factor to the exclusion of others." Lovely Skin, 745 F.3d at 889 (quotations omitted). "[T]he relative weight of the factors depends on the facts of the individual case." Id., at 887 (quotations omitted). This is true whether on claims for false designation of origin, trademark infringement, or unfair competition. See id.

The likelihood of confusion analysis is streamlined where, as here, the defendant uses the plaintiff's name and mark to pass off its product as the plaintiff's product. See, e.g., Mid-List Press v. Nora, 374 F.3d 690, 693 (8th Cir. 2004). In such a case, the likelihood of confusion is "obvious": "Few . . .cases demonstrat[e] a more obvious and imminent likelihood of confusion." Id. (quoting Johnson v. Jones, 149 F.3d 494, 503 (6th Cir. 1998)). Indeed, where "the defendant has taken the plaintiff's product and has represented it to be his own work[,] [i]t is difficult to imagine how a designation of origin of a product could be more false, or could be more likely to cause confusion or mistake as to the actual origin of the product." Johnson, 149 F.3d at 503; Christ Copyright Corp., 634 F.3d at 1009 ("[W]hen identical marks are used in the same geographic area for the same class of goods or services, likelihood of confusion is presumed." (quoting Solutech, Inc. v. Solutech Consulting Servs., Inc., 153 F. Supp. 2d 1082, 1088 (E.D.

18

Mo. 2000))).

Stated otherwise, a defendant's use of the plaintiff's actual name or mark to pass off its product as the plaintiff's product is sufficient to demonstrate an "obvious" likelihood of confusion.  See, e.g., Johnson, 149 F.3d at 503; see also Mid-List Press, 374 F.3d at 693 (quoting Johnson); Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618 F.3d 417, 438–39 (4th Cir. 2010); Suntree Techs., Inc. v. EcoSense Int'l, Inc., 802 F. Supp. 2d 1273, 1284 (M.D. Fla. 2011), aff'd, 693 F.3d 1338 (11th Cir. 2012).  When a defendant creates this "obvious" likelihood of confusion by passing of its goods as those of the plaintiff, courts dispense with the need to inquire about most of the typical factors, such as the distinctiveness or secondary meaning of the trademarks involved.  Johnson, 149 F.3d at 503 ("Most of the [likelihood of confusion] factors are irrelevant to this inquiry because they deal with the relationship between the plaintiff's and defendant's trademarks, not their products."); see also, e.g., Suntree, 802 F. Supp. 2d at 1284 (focusing only on factors of intent and actual confusion); Target, 2002 WL 999280, at *6–7 ("no such piecemeal analysis is required" in passing off case where the defendant service provider represented that it was the plaintiff, a different service provider).

> a. **Yield Nation's Conduct Demonstrates a Clear Likelihood of Confusion.**

Yield Nation's false statements about Nutriplant® and misleading use of the Nutriplant® name, mark, and images to deceive consumers about the source of its products demonstrate a likelihood of confusion.  Yield Nation uses Plaintiffs' "actual mark, not merely a similar mark, to pass off his product as the plaintiff[s']."  Mid-List Press, 374 F.3d at 693; cf. Target, 2002 WL 999280, at *6–7 (likelihood of confusion where former-employee defendants pretended to work for plaintiff company in connection with making sales after their termination).  Yield Nation's conduct therefore creates an "obvious and imminent likelihood of confusion."  Mid-List Press,

374 F.3d at 693; <u>Christ Copyright Corp.</u>, 634 F.3d at 1009–10; <u>Hallmark Indus., Inc. v. Hallmark Licensing, LLC</u>, 417 F. Supp. 3d 1180, 1189 (W.D. Mo. 2019) (same).  For this reason alone, Plaintiffs have demonstrated the "likelihood of success" element of their unfair competition and trademark claims.

**b.    The Evidence Shows that Consumers Are Likely to Be Confused or Deceived.**

The factors that typically guide the likelihood of confusion analysis confirm this conclusion, even if the circumstances obviate the need to analyze Yield Nation's conduct in light of the "obvious" confusing and misleading nature of its passing off and infringement.

i. <u>Strength of the Mark</u>

The strength of the trademark favors Plaintiffs.  Nutriplant® is a registered mark and is licensed only for use by certain Alticor subsidiaries, including Amway.  Ex. 1, Seurynck Decl. ¶¶ 5–6, 8.  Further, Nutriplant® is a coined term that is inherently distinctive and "serves to identify a particular source of a product," and thus is entitled to protection.  <u>Two Pesos, Inc. v. Taco Cabana, Inc.</u>, 505 U.S. 763, 768 (1992).  On the spectrum of trademark strength, Nutriplant® is, at minimum, a suggestive mark because it identifies a specific source of the products.  <u>See id.</u>  This is demonstrated by, for example, the fact that the farms to whom Yield Nation sold its products associated the Nutriplant® brand with a specific product line with its own particular attributes, rather than just a generic fertilizer or seed treatment.  Ex. 3, Schewe Decl. ¶¶ 5–8, 14. This factor favors Plaintiffs.

ii. <u>Similarity of the Marks</u>

The second factor favors Plaintiffs because Yield Nation uses the Nutriplant® name and mark to sell Yield Nation's product.  Yield Nation falsely is claiming that its product <u>is</u> Nutriplant®.  Yield Nation is not using a name or mark <u>similar to Nutriplant</u>®; it is using the

20

Nutriplant® mark itself.  This factor supports a finding of likelihood of confusion.

### iii. Competition Between Plaintiffs' and Defendant's Products

The third factor "asks the degree to which the allegedly infringing product competes with Plaintiffs' goods."  Sensient Techs. Corp. v. SensoryEffects Flavor Co., 636 F. Supp. 2d 891, 900 (E.D. Mo. 2009).  If the products are closely related, confusion among customers is more likely.  Davis v. Walt Disney Co., 430 F.3d 901, 904 (8th Cir. 2005).  Here, Yield Nation's products compete directly with Plaintiffs' Nutriplant® products.  Indeed, Yield Nation sells a foliar spray and seed treatment (and targets those sales at existing Nutriplant® customers), all while telling those customers that it is selling Nutriplant® products.  See, e.g., Ex. 13, Zimmerman Decl. ¶¶ 2–5; Ex. 12, Waier Decl. ¶¶ 3–8; Ex. 3, Schewe Decl. ¶¶ 3–9; Ex. 8, LaFont Decl. ¶¶ 3–8; Ex. 4, Klockenga Decl. ¶¶ 3–5; Ex. 10, Rapp Decl. ¶¶ 3–7; Ex. 7, Greenwood Decl. ¶¶ 3–10; Ex. 2, Maubach Decl. ¶¶ 3–7; Ex. 6, Feezel Decl. ¶¶ 3–9.  This factor weighs fully in favor of Plaintiffs.

### iv. Yield Nation's Intent to Deceive

Yield Nation's intent to deceive customers about the source of its agricultural products cannot be in doubt.  Yield Nation is not claiming to sell a product similar to Nutriplant®, it is claiming to sell Nutriplant®.  See, e.g., Ex. 3, Schewe Decl. ¶¶ 3–9; Ex. 13, Zimmerman Decl. ¶¶ 2–5; Ex. 6, Feezel Decl. ¶¶ 3–9.  Yield Nation's wholesale use of the Nutriplant® name and depictions of the Nutriplant® products in its sales materials illustrates its intent to deceive consumers into believing that it is selling Nutriplant®.  See MSP Corp. v. Westech Instruments, Inc., 500 F. Supp. 2d 1198, 1210 (D. Minn. 2007).  This conclusion is supported by the fact that Yield Nation targeted farmers to whom its sales representative, Buckwalter, previously sold Nutriplant®.  Under these circumstances, "It is difficult to imagine how a designation of origin

21

of a product could be more false, or could be more likely to cause confusion or mistake as to the actual origin of the product." <u>Mid-List Press</u>, 374 F.3d at 693 (quotations omitted); <u>Target</u>, 2002 WL 999280, at *6–7 ("The [Defendants'] alleged actions had no purpose other than to convince the customers that they were the 'real' [service provider].").

v. <u>Evidence of Actual Confusion</u>

Incidents of actual confusion "are proof of the likelihood of confusion." <u>Sensient Techs. Corp. v. SensoryEffects Flavor Co.</u>, 613 F.3d 754, 768 (8th Cir. 2010). Yield Nation's representations and use of the Nutriplant® name, mark, and images has, in several instances, resulted in actual consumer confusion about the source and identity of Yield Nation's agricultural products. <u>See, e.g.</u>, Ex. 6, Feezel Decl.; Ex. 7, Greenwood Decl.; Ex. 4, Klockenga Decl.; Ex. 8, LaFont Decl.; Ex. 9, Lemke Decl; Ex. 2, Maubach Decl; Ex .10, Rapp Decl.; Ex. 11, Roser Decl; Ex. 3, Schewe Decl; Ex. 12, Waier Decl; Ex. 13, Zimmerman Decl.

Plaintiffs' evidence includes sworn statements of 12 customers from Missouri and Illinois. The customers' accounts show that Yield Nation is engaged in an organized and systematic scheme to trade on the reputation and goodwill of Nutriplant® for Yield Nation's commercial advantage. In all cases, Yield Nation deceived, misled, and confused existing or new Nutriplant® customers about the true source of the Yield Nation products. The only reason those customers purchased Yield Nation's products is because they believed, based on Yield Nation's statements and use of the Nutriplant® name, mark, and images, that they were buying Nutriplant®. <u>See, e.g.</u>, Ex. 9, Lemke Decl. ¶ 16. Had the farmers known they were not buying Nutriplant, they would not have placed orders with Yield Nation. <u>See, e.g.</u>, Ex. 3, Schewe Decl. ¶ 19; Ex. 4, Klockenga Decl. ¶ 14.

Customers also are being confused, misled, and deceived about the quality and

22

performance of Nutriplant®.  See, e.g., Ex. 8, LaFont Decl. ¶ 12 ("Because Mr. Buckwalter

insisted that the Yield Nation product I received was the same as the Nutriplant product I

previously received in different packaging, I believed at the time that the Nutriplant products

were no longer high quality."); see also, e.g., Ex. 4, Klockenga Decl. ¶ 12.  Because customers

believe (falsely) that the product they received from Yield Nation is Nutriplant®, when the

product arrives in defective or unusable form, does not mix, clogs their equipment, or otherwise

fails to perform, the customers attribute those quality issues to Nutriplant®.

The deception is compelling.  Even where customers have observed differences in the

packaging, physical properties, and performance between the Nutriplant® products they had

used in previous years and the products sold to them by Yield Nation, many customers were so

convinced by Yield Nation's artifice that they continued to believe these very different products

were, in fact, the same.  See, e.g., Ex. 8, LaFont Decl. ¶ 12.  This factor strongly favors

Plaintiffs.

vi. Degree of Care Reasonably Expected of Potential Customers

In considering the degree of care reasonably expected of potential customers, a court

stands "in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of

the market and giving the attention such purchasers usually give in buying that class of goods."

Luigino's, Inc. v. Stouffer Corp., 170 F.3d 827, 831 (8th Cir. 1999) (quotations omitted).

Because Yield Nation presents its products as Nutriplant® products, even sophisticated

consumers who deliberate over their decision of what specific agricultural product to buy

necessarily cannot distinguish between Nutriplant® and the product Yield Nation is purporting

to sell.  See id.  This factor supports a finding of likelihood of confusion.

The foregoing factors conclusively demonstrate that Plaintiffs can satisfy the "likelihood

of confusion" element for both their unfair competition and trademark claims.

        **c.**        **Yield Nation's False Designation of Origin and Trademark Infringement Has Harmed the Reputation and Goodwill of Plaintiffs' Product and Has Caused Plaintiffs' Actual Damages.**

To obtain injunctive relief under the Lanham Act, Plaintiffs do not need to show actual damages.  Porous Media, 110 F.3d at 1335.  In any event, Plaintiffs' evidence demonstrates that Yield Nation's conduct is causing substantial and irreparable harm to Plaintiffs, and also is diverting sales from Plaintiffs. See Section B, *infra*; Section IX, *supra*.

For the foregoing reasons, the evidence shows that Plaintiffs are likely to succeed on the merits of the unfair competition and trademark claims.

**B.**        **Plaintiffs Will Suffer Immediate and Irreparable Harm if Yield Nation Is Not Enjoined.**

The second of the four preliminary injunction factors is whether the movant will suffer irreparable harm absent an injunction.  The threat of irreparable harm exists where the movant shows harm is likely to occur and there will be no adequate remedy at law if the nonmovant is not enjoined.  Rogers Grp., Inc. v. City of Fayetteville, Ark., 629 F.3d 784, 789 (8th Cir. 2010).  Here, Plaintiffs are suffering and will continue to suffer immediate and irreparable harm as a result of Yield Nation's actions unless Yield Nation is enjoined.

As a preliminary matter, because Plaintiffs have demonstrated that they are likely to succeed on the merits of their claims, they are entitled to a rebuttable presumption of irreparable harm for purposes of their motion for preliminary injunction.  15 U.S.C.A. § 1116 (2020) ("A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of . . . likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction.").  Yield Nation cannot overcome

this presumption.

In any event, Yield Nation's deceptive acts independently establish irreparable harm. Yield Nation's conduct is actively harming the reputation and goodwill of Plaintiffs' brand, Nutriplant®, and of Plaintiffs themselves.  See, e.g., Ex. 8, LaFont Decl. ¶ 12; Ex. 4, Klockenga Decl. ¶ 13; Ex. 10, Rapp Decl. ¶¶ 12, 14; Ex. 2, Maubach Decl. ¶ 18.  Where consumers believe Yield Nation's claim that it is selling Nutriplant® and proceed to purchase what they believe is Nutriplant®, Plaintiffs are injured in multiple ways, including by potentially losing customers to Yield Nation and also by potentially losing customers due to the defects in the products the customers receive from Yield Nation.  These types of injuries support a finding of irreparable harm.  See, e.g., Charter Commc'ns, Inc. v. Sw. Bell Tel. Co., 202 F. Supp. 2d 918, 930 (E.D. Mo. 2001).  Yield Nation's conduct also is harming Plaintiffs by confusing Plaintiffs' customers about the source of a product Yield Nation is marketing as Nutriplant®, which likewise is an injury that "cannot be corrected by damages paid after the fact."  Bebe Stores, Inc. v. May Dep't Stores Int'l, Inc., 230 F. Supp. 2d 980, 995 (E.D. Mo. 2002); Charter, 202 F. Supp. 3d at 930. Because these harms cannot be measured in money damages, Plaintiffs do not have an adequate remedy at law and an injunction is warranted.  Id.

**C.    The Harm to Plaintiffs if Relief is Denied Outweighs Any Injury that Yield Nation May Suffer from the Issuance of an Injunction.**

The balance of the equities strongly favors Plaintiffs.  If Yield Nation is not enjoined, Plaintiffs will continue to suffer immediate and irreparable harm to the reputation and goodwill of their Nutriplant® brand, in the ways discussed above.  In contrast, Yield Nation will suffer no injury if it is enjoined from making false representations about the source of its products. Therefore, the harm to Plaintiffs if their motion for preliminary injunction is denied outweighs any injury that Yield Nation may suffer if an injunction is issued.

#### D.      Entry of an Injunction Advances the Public Interest.

"[T]he public interest favors enjoining false statements."  United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1184 (8th Cir. 1998).  "The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks."  ADT, LLC v. Capital Connect, Inc., 145 F. Supp. 3d 671, 700 (N.D. Tex. 2015).  The unfair competitive practices and tortious acts perpetrated here by Yield Nation undermine the significant public interest in safeguarding businesses from unfair and illegal practices.  The public interest further favors enjoining Yield Nation in that Yield Nation's conduct is contrary to the public interest in protecting consumers from deceptive practices.

### III.   Yield Nation's Conduct Is the Kind of Conduct that Courts Enjoin for Violating § 1125(a)(1)(A).

Further buttressing the likelihood that Plaintiffs will succeed on the merits of their claim, Yield Nation's passing off scheme is the same kind of conduct that has been found to violate § 1125(a)(1)(A).  Numerous false designation cases, for example, involve the defendant's use of a photograph of a competitor's product to advertise the defendant's goods.  See Co-Rect, 780 F.2d at 1330–31 (citing L'Aiglon Apparel Inc. v. Lana Lobell, Inc., 214 F.2d 649, 650 (3d Cir. 1954)); Truck Equip. Serv. Co. v. Fruehauf Corp., 536 F.2d 1210, 1215–16 (8th Cir. 1976) ("The use of another's product, misbranded to appear as that of a competitor, has been repeatedly found to be 'a false designation of origin' actionable under s 43(a)."); L'Aiglon Apparel, 214 F.2d at 650 (false designation where defendant ran advertisement for its own dress using photos of competitor's dress.  Similarly, courts have found unfair competition where a competitor used part of a plaintiff's tradename and duplicated portions of the plaintiff's sales catalogues to cause purchasers to believe they were buying the plaintiffs' goods from the plaintiff when, in truth, they were buying different goods from the defendant.  Metric & Multistandard Components

26

<u>Corp.</u>, 635 F.2d at 714.

Because the overwhelming evidence demonstrates that (a) Yield Nation has used statements, names, marks, and images to falsely designate Nutriplant® as the source of its products and (b) Yield Nation's use of these statements, names, marks, and images is likely to confuse consumers about the source of its products, a reasonable jury is likely to find that Plaintiffs' will succeed on the merits of their claims.  <u>Mid-List Press</u>, 374 F.3d at 693.

### Conclusion

Yield Nation is actively and deliberately passing off its products as Nutriplant® products. When it delivers its inferior and defective products, it continues is deception by insisting to farmers that it is the same product as Nutriplant®.  This ongoing deception leads Nutriplant® customers to believe that Nutriplant® is no longer a high quality, reliable product, and is actively harming the Nutriplant® brand.

The record illustrates that Plaintiffs are likely to succeed on the merits of their unfair competition and trademark infringement claims.  If a preliminary injunction is not granted, Plaintiffs will be irreparably harmed by Yield Nation's ongoing deception.  The balance of the burdens associated with a preliminary injunction plainly favors Nutriplant®.  Such an injunction would only bar Yield Nation from making false designations of origin regarding its products. Finally, public policy favors issuing an injunction here.  For these reasons, Plaintiffs request that the Court grant their motion for a preliminary injunction and enter an order granting the relief requested in Plaintiffs' Motion.

Dated: March 12, 2021

Respectfully Submitted,

**DOWD BENNETT LLP**

By: /s/ Matthew K. Crane
   Matthew K. Crane #65854
   7733 Forsyth Blvd., Suite 1900
   St. Louis, Missouri 63105
   (314) 889-7300 (telephone)
   (314) 863-2111 (facsimile)
   mcrane@dowdbennett.com

and

**WARNER NORCROSS & JUDD, LLP**

   Edward. J. Bardelli *(pro hac vice pending)*
   Paul Beach *(pro hac vice pending)*
   1500 Warner Building
   150 Ottawa Ave N.W.
   Grand Rapids, MI 49503
   (616) 485-9917 (telephone)
   ebardelli@wnj.com
   pbeach@wnj.com

   *Attorneys for Plaintiffs*

<u>**Certificate of Service**</u>

The undersigned certifies that on March 12, 2021 a true and correct copy of the foregoing was electronically filed using the Court's electronic filing system. By operation of that system a notice of electronic filing will be served upon all counsel of record in the case.

/s/ Matthew K. Crane